ROBINS DRY DOCK AND REPAIR COMPANY, Plaintiff, *v.* NAVIGAZIONE LIBERA TRIESTINA, S. A., and Another, Defendants.*

Supreme Court, New York County, October 6, 1931.

* Affd., 235 App. Div. 841; affd., 261 N. Y. 455.

*Crowell & Rouse* [*E. Curtis Rouse* of counsel] and *Clarke, Allen, Harper & Matthews* [*Harold Harper* of counsel], for the plaintiff.

*Loomis & Ruebush* [*Homer L. Loomis* of counsel], for the defendant Navigazione Libera Triestina, S. A.

*Macklin, Brown, Lenahan & Speer* [*Richard F. Lenahan* of counsel], for the defendant Moran Towing & Transportation Co., Inc.

UNTERMYER, J. The steamship *Brenta II*, an Italian vessel owned by the defendant Navigazione Libera Triestina, S. A., on January 21, 1926, lay in a slip in the Erie basin, her bow towards the plaintiff's graving dock, distant about 150 feet. Along her port side and almost touching her lay the steamer *El Siglo*.

The *Brenta II*, then under steam, was to sail that day, and her agents, the Columbus Marine Corporation, had arranged with the defendant Moran Towing & Transportation Co., Inc., to take the ship out of the Erie basin into Red Hook channel, there to be turned over to the Sandy Hook pilot. The Moran Company sent two tugs, the *Agnes Moran*, which attached a line to the *Brenta II's* bow, and the *C. P. Raymond*, which took a line from her stern starboard quarter. Healey, the captain of the *Agnes Moran*, boarded the steamer and, acting as harbor pilot, assumed command of the undocking operations. To undock the *Brenta II*, it was necessary to take her out stern foremost until her bow was clear of the slip, then to head her out of the basin into the stream. Instead of proceeding directly astern, however, the vessel went forward, struck the plaintiff's graving dock caisson, damaging its plates and machinery to the extent of $19,080. At the moment of impact the vessel started to go astern, backed out of the slip and proceeded to sea.

The plaintiff first brought suit in the United States District Court to recover damages from the *Brenta II's* owners, the defendant Navigazione Libera Triestina, S. A. That action resulted in a verdict of the jury in favor of the defendant, which, however, was reversed on appeal and a new trial ordered (*Robins Dry Dock & Repair Co.* v. *Navigazione Libera Triestina*, 32 F. [2d] 209).

The plaintiff then sought to discontinue the action in the Federal court and to join the Moran Towing & Transportation Co., Inc., as a defendant to a suit in this court, with the intent of determining which of the defendants was responsible for the collision. (Civ. Prac. Act, § 213.) In order to procure that relief the plaintiff entered into a stipulation with the steamship company providing for the taking by deposition of the testimony of the captain and the mate of the *Brenta II*. This testimony, which was received at the trial, is in sharp conflict with that offered on behalf of the Moran Company as to the cause of the collision, but it was not binding on the Moran Company, which was not afforded an opportunity to be represented at the examination of these witnesses and was not a party to the stipulation.

The defendant Moran Towing & Transportation Co., Inc., attempted to establish through the testimony of Healey, who was in charge of the undocking operations, that the collision was caused by the failure of the ship's engines to respond to his orders. Healey testified that he first ordered the ship's engines to be put half astern, that the signal was properly registered on the telegraph indicator and correctly acknowledged from the engine room, but that the ship began to move forward instead of astern. He testified that

as soon as he observed the forward movement of the vessel he ordered the ship's engines placed at full speed astern. This signal was likewise properly transmitted over the telegraph and properly acknowledged, but the ship continued even more rapidly in its forward motion, the bow line to the tug *Agnes Moran* parted, and the *Brenta II* struck the graving dock gate before it could reverse direction.

If this version of the occurrence were to be accepted, the fault for the collision would, of course, be attributable to the crew or engines of the *Brenta II*. However, even disregarding the evidence offered on behalf of the defendant steamship company, I cannot give credence to Healey's testimony. He was an evasive witness, displaying his obvious interest in clearing himself of the charge of faulty navigation. Corroboration for his story is utterly lacking, even in the testimony of the Sandy Hook pilot that he observed the ship's forward motion while the telegraph indicator was set astern, for if the ship was going forward it would have taken appreciable time before her engines could take effect in response to an order to go astern. It is highly improbable that the crew in the engine room would twice have made the same mistake of placing the engines ahead when they were ordered to be placed astern, and even more improbable that on each of these occasions they would have correctly recorded the order on the ship's indicator.

It is, furthermore, difficult to believe that Healey would have used the telegraph to order the ship's engines full speed astern upon discovering, as he now claims, that his previous order to go ahead had been correctly acknowledged from the engine room, but had been executed as an order to go astern. In that event he would certainly have used the ship's telephone to rectify the error.

The improbability of his account of these occurrences is also attested by the verdict of the jury in favor of the defendant in the suit in the United States District Court, where Healey was the principal witness for the plaintiff, and where the defendant rested its case without offering any evidence at all.

Healey's testimony is, moveover, refuted by other circumstances. The *Brenta II* was equipped with a propeller turning to the right, which, due to the light cargo the ship was carrying, protruded from the water. Healey, himself, conceded that if the propeller was put astern it would have tended to kick the stern of the vessel towards the port side, where the steamer *El Siglo* lay, almost touching her. Under these conditions the folly of ordering the ship's engines half speed astern, as Healey claims he did, and proceeding directly astern under the ship's own power, is apparent. Healey's explanation was that he expected the tug *C. P. Raymond* to offset

the movement of the propeller by pulling the stern towards the starboard quarter, but his own testimony and that of the captain of the tug reveal that he gave no such order.

The conclusion is thus irresistible that the collision did not result from any misunderstanding or disobedience of Healey's orders on the part of the *Brenta II's* crew or any failure of the ship's engines, but that Healey gave two successive orders to go ahead. In view of the improbability of Healey's testimony and his obvious interest, I do not consider that I am bound to believe his explanation. (*Elwood* v. *Western Union Tel. Co.*, 45 N. Y. 549; *Wohlfahrt* v. *Beckert*, 92 id. 490; *Gaffney* v. *N. Y. Consolidated R. R. Co.*, 220 id. 34.) The accident may fairly be attributed to Healey's failure to make due allowance for the strong breeze which was blowing or to his delay in ordering the ship's engines astern.

Finding, therefore, as I do, that the accident occurred in consequence of Healey's negligent navigation of the vessel, the question is presented as to which of the two defendants is liable for the damage caused thereby. The defendant steamship company insists that the service rendered by Healey in moving the steamer from her berth to the stream was that of a " compulsory pilot " for whose acts the vessel owner is not liable. (*Homer Ramsdell Co.* v. *Comp. Gen. Trans.*, 182 U. S. 406.) The laws of this State require that the master of a foreign vessel, or a vessel sailing under register, bound to or from the port of New York by way of Sandy Hook, shall take a pilot licensed under the laws of New York or New Jersey (Laws of 1882, chap. 410, §§ 2119, 2120). Although Healey was a licensed United States pilot, there is no proof that he was licensed by the State, and it was assumed throughout the trial that he was not. While the State pilotage laws are regulations of commerce, they fall within that class of powers which may be exercised by the States until Congress shall have abrogated them, and this Congress has not yet undertaken to do. (U. S. R. S. §§ 4401, 4444; U. S. Code, tit. 46, §§ 215, 364; *Anderson* v. *Pacific Coast S. S. Co.*, 225 U. S. 187; *Board of Pilot Commrs.* v. *Pacific Mail S. S. Co.*, 52 N. Y. 609; *Henderson* v. *Spofford*, 59 id. 131.) Healey was, therefore, not qualified, by virtue of his Federal license, to pilot a foreign or registered vessel in the port of New York (*Anderson* v. *Pacific Coast S. S. Co.*, *supra; Murray* v. *Clark*, 4 Daly, 468; affd., 58 N. Y. 684; *State* v. *Ring,* 122 Ore. 644; 259 P. 780), and the master of the *Brenta II* could not, therefore, have accepted him as a " compulsory pilot." He was a pilot voluntarily accepted under the contract between the Moran Towing & Transportation Co., Inc., and the vessel owner's agent.

The liability of either defendant for Healey's negligence in conducting the undocking operations must thus rest solely on the application of the doctrine of *respondeat superior*. (*Maxmilian* v. *Mayor*, 62 N. Y. 160, 163.) Healey was in the general employ of the towing company, but the law recognizes that a servant in the general service of one may be transferred for a limited time to the service of another, who then becomes responsible for his negligence. On the other hand, if the general employer contracts to perform services for another, as independent contractor, his employees do not, of course, become the servants of the person with whom he thus contracts. (*Standard Oil Co.* v. *Anderson*, 212 U. S. 215; *McNamara* v. *Leipzig*, 227 N. Y. 291; *Hartell* v. *Simonson & Son Co.*, 218 id. 345.) A determination whether any given case falls within one class or the other often involves a consideration of many circumstances relating to the degree of control and supervision over the servant's acts. But the ultimate question resolves itself into a simple inquiry as to whose business the servant was engaged in at the time of the occurrence of the negligent act. (*Braxton* v. *Mendelson*, 233 N. Y. 122.)

Under the circumstances ordinarily incident to a contract of towage, the towing company is an independent contractor and remains liable for the negligence of any pilot it provides, notwithstanding that the pilot assumes control of the tow and makes use of its own power. (*Wilmington Ry. Bridge Co.* v. *Franco-Ottoman S. Co.*, 259 Fed. 166; *The Dorset*, 260 id. 32; *The Allaguash*, 1930 A. M. C. 1981; *Calzavaro* v. *Planet S. S. Corp.*, 31 F. [2d] 885.) It follows that in the absence of special agreement the Moran Company, and it alone, would be liable for the acts of Healey.

The Moran Company contends, however, that it is relieved from liability in this precise situation by the following " pilotage clause " contained in its schedule of rates, of which I find the steamship company's agent to have had at least constructive knowledge: " When the captain of any tug engaged in the service of assisting a vessel which is making use of her own propelling power goes on board said vessel or any other licensed pilot goes on board said vessel, it is understood and agreed that said tugboat captain or any other licensed pilot becomes a servant of the owners in respect to the giving of orders to any of the tugs engaged in the assisting service and in respect to the handling of said vessel and neither the tugs or their owners or agents shall be liable for any damage resulting therefrom." If this clause is determinative in fixing the relationship between the parties here, the towing company must be absolved from liability (*The Wireless No. 1*, 290 Fed. 239), for then the acts of Healey while on board the steamer were not within the scope of

his general employer's business, and he became a servant of the steamship company in navigating the vessel from the slip under its own steam.

There is no doubt that, as between the defendants, the " pilotage clause" would be effective in fixing their respective liability. (*Graves* v. *Davis*, 235 N. Y. 315. Cf. *The Syracuse*, 12 Wall. 167; *Compania de Navegacion* v. *Ins. Co.*, 277 U. S. 66, 73.) As between themselves the owners of the tug and the tow might adjust their rights and obligations by whatever special agreement they might see fit to make. But as to persons not parties thereto the liability of the defendants must be measured by the actual relation of each of the defendants to Healey at the moment of the accident.

That relation must be determined by all the facts surrounding Healey's employment. It is by no means conclusively established by what the parties in the " pilotage clause " declared those relations to be. (*Finegan* v. *Piercy Cont. Co.*, 189 App. Div. 699; *Buck* v. *Standard Oil Co.*, 224 id. 299; affd., 249 N. Y. 595; *The Syracuse, supra.*) If Healey was in fact engaged in the business of the Moran Company, then that company could not divest itself of liability to third persons by calling him the servant of another. The language of the parties could not have been made strong enough to change the essential character of the relation by any change of name. It must be implied from all the surrounding circumstances even though these may be contradictory or disputed. (*Braxton* v. *Mendelson, supra*, p. 124; *Howard* v. *Ludwig*, 171 N. Y. 507.)

Tested by these principles, I am of the opinion that as to the plaintiff, Healey, notwithstanding the " pilotage clause," remained the servant of the towing company. The Columbus Marine Corporation, the agents of the owner of the *Brenta II*, engaged the towing company not only to provide tugs suitable for the particular work to be done, but to provide a pilot also. The towing company was informed that the vessel to be " undocked " was under steam. No suggestion was made to the towing company as to the manner in which the undocking should be carried out or whether or not the ship's own power should be used. When the tugs arrived, Healey, who was in charge of the operation for the towing company, immediately boarded the steamer, went to the bridge and assumed command of the situation by directing the movements of the tugs as well as those of the ship. The master and crew of the *Brenta II* in executing Healey's orders were mere instrumentalities used by Healey to apply the wheel, the engine and the other instruments of navigation, which in conjunction with the tugs were used to undock the vessel. Control and direction and the choice of methods rested exclusively with Healey as the representative of the towing com-

pany. The conduct of all the parties thus rather plainly shows that there was at least a tacit understanding that the Moran Company was engaged to render a general service in undocking the steamer and was not merely to provide tugs to assist the *Brenta II* in the undocking operation. The towing company must, therefore, be considered an independent contractor in this venture, and since Healey was employed in carrying out its business it is liable to third persons for his negligence.

Moreover, by the statute it was a misdemeanor for any one not authorized to have piloted the *Brenta II*. It may, therefore, fairly be implied that the " pilotage clause " contemplated that the pilot to be supplied should be duly licensed for the service contracted for. Since, as previously stated, Healey was not licensed to pilot the *Brenta II*, it cannot be said that the steamship company consented to the transfer of his services and to assume the liability incident thereto. If, as I believe, the Moran Company contracted generally to undock the vessel and to supply a pilot for that purpose, it could not relieve itself of liability under the " pilotage clause " by furnishing a pilot not licensed for the operation.

The question remains whether the captain of the *Brenta II* was also negligent in failing to displace Healey from command or in failing to take proper measures to avert the collision. (*The Marcellus Baxter* v. *Camp*, 66 U. S. [1 Black] 414; 17 L. Ed. 217; *The China*, 74 U. S. 53; *Jure* v. *United Fruit Co.*, 6 F. [2d] 6.) I am of the opinion that he was not. The deposition of the captain, which in this respect is corroborated by the plaintiff's witnesses, establishes that no more than two and a half minutes elapsed from the time the ship started forward until the collision occurred. The captain testified that he did not approve even of Healey's first order placing the engine " slow ahead; " that he cautioned him then, but that it was not until Healey ordered the engines half speed ahead that he became alarmed and insisted that the engine be reversed. Before complying with that order Healey hesitated only about twenty seconds. I am not prepared to hold that in so brief a time the captain was negligent in failing to remove Healey from command. That duty, though it exists, should, I think, be exercised only in exceptional cases, for it is likely to result in confusion of counsel and division of responsibility. (*The Maria*, [1839] 1 Wm. Rob. 95, 110; MacLachlan's Law of Merchant Shipping [6th ed.], p. 210.)

In this respect the situation disclosed by the evidence here differs essentially from the uncontradicted facts before the court in *Robins Dry Dock & Repair Co.* v. *Navigazione Libera Triestina* (*supra*), where it appeared without contradiction that the captain permitted

the vessel to proceed forward at a constantly accelerating speed for a period of four and one-half to five minutes. If these were the facts here, I would unhesitatingly follow the conclusion of the court in that case. But upon the facts as I find them to have existed here, and taking into account that the collision would have been averted if Healey had reversed the engines only a few seconds earlier than he did, the captain might well have believed that it would increase the risk if he displaced the pilot in the midst of a delicate maneuver requiring the exercise of a special skill, which the pilot was supposed to possess. (*Dampskibsselskabet Atalanta A/S* v. *United States*, 31 F. [2d] 961; *Ralli* v. *Troop*, 157 U. S. 386; *The Maria, supra.*)

I accordingly direct judgment in favor of the plaintiff as against the defendant Moran Towing & Transportation Co., Inc., for the sum of $19,080, with interest from January 21, 1926, together with costs herein, and judgment in favor of the defendant Navigazione Libera Triestina, S. A., with costs.